**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
        jwilner@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENJAMIN GLENN and ARA SARDARBEGIANS, individually and on behalf of all others similarly situated,<br><br>                     Plaintiffs,<br>   v.<br><br>MIXPANEL, INC.,<br><br>                Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**PAGE**

NATURE OF THE ACTION ................................................................................................1

THE PARTIES ...................................................................................................................2

JURISDICTION AND VENUE .........................................................................................3

FACTUAL ALLEGATIONS ..............................................................................................3

    I.    THE CIPA AND WESCA PROTECT CALIFORNIANS' AND PENNSYLVANIANS' RIGHT TO PRIVACY IN THEIR ONLINE COMMUNICATIONS .............................................................................................3

        A.    Background Of The CIPA ..........................................................................3

            1.    CIPA § 631 ...................................................................................4

            2.    CIPA § 638.51 ..............................................................................5

        B.    Background Of The WESCA .....................................................................6

    II.    DEFENDANT VIOLATES THE CIPA AND THE WESCA ................................7

        A.    Testing Reveals Defendant Collects App Users' Personally Identifying Information Without Their Consent ...............................................7

            1.    Defendant Collects App Users' Precise Geolocation ........................9

            2.    Defendant Collects App Users' AAIDs ..........................................10

            3.    Defendant Collects App Users' Device IDs and User IDs ................11

        B.    Defendant Bridges Users' PII Across Multiple Apps .................................12

        C.    Defendant Builds Comprehensive User Profiles Targeted Marketing, Advertising, And Analytics ........................................................15

    III.    PLAINTIFFS' EXPERIENCES ...........................................................................20

        A.    Plaintiff Glenn ..........................................................................................20

        B.    Plaintiff Sardarbegians ..............................................................................21

CLASS ALLEGATIONS ....................................................................................................22

CAUSES OF ACTION.........................................................................................................24

    COUNT I...................................................................................................................24

    COUNT II..................................................................................................................26

    COUNT III.................................................................................................................27

PRAYER FOR RELIEF.......................................................................................................29

JURY TRIAL DEMANDED ...............................................................................................30

Plaintiffs Benjamin Glenn and Ara Sardarbegians ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant Mixpanel, Inc. ("Mixpanel" or "Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    This is a class action suit brought against Defendant for its unauthorized collection of communications and personally identifying information from users of the Android version of the Upside mobile application (the "App").

2.    The App is "designed to reward you for simply being yourself" by getting users "cash back on daily essentials like gas, groceries, and dining."[1] When App users shop at one of the over 50,000 participating locations, they can claim cash back offers for shopping at those stores.[2] Cash back earnings can be deposited "directly to your bank account, PayPal, or a gift card."[3]

3.    Unbeknownst to App users, however, Defendant's software is installed in the App. Using its SDK, Defendant collects information on App users, including users' interactions with the App and "cashback claims," App users' precise geolocation, and other user identifiers such as App users' Android Advertising IDs ("AAIDs"):

## Summary of Third-Party Exfiltration 🤖

| THIRD PARTY | PRODUCT INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| **Mixpanel** | User interactions, Cashback claims, Viewed store names, Distance to stores | Geolocation | User ID, AAID, Device ID |

4.    Not only does the information Defendant collects from App users alone allow it to de-anonymize and identify users, Defendant is also able to bridge that information to those same users' interactions with other mobile applications using their AAIDs. Thus, through the information

---

[1] https://play.google.com/store/apps/details?id=com.upside.consumer.android.

[2] *Id.*

[3] https://www.upside.com/.

it collects from App users, Defendant builds comprehensive user profiles that tell it who users are, where they live, and where they like to shop. Defendant then provides those profiles to its clients (like Upside) for targeted marketing and advertising and comprehensive data analytics. All of this is done without the knowledge and consent of App users like Plaintiffs. Such digital surveillance constitutes an enormous invasion of privacy.

5.    Plaintiffs present two alternative theories of liability that apply to Defendant's conduct. If Plaintiffs' interactions with the App are the "contents" of Plaintiffs' communications, then Defendant has read, learned, and intercepted Plaintiffs' and App users' communications without consent in violation of Section 631 of the California Invasion of Privacy Act ("CIPA"), and Pennsylvania's Wiretapping and Electronic Surveillance Act ("WESCA"), 18 Pa. Con. Stat. §§ 5701, *et seq.*

6.    If Plaintiffs' interactions with the App are *not* the "contents" of their communications, however, then Defendant has violated CIPA § 638.51(a) by using a "pen register" (the Mixpanel SDK) to collect Plaintiffs' and App users' "routing, addressing, or signaling information" (their precise geolocation and other identifiers) for use in comprehensive user profiles and tracking.

7.    In either case, Plaintiffs bring this action on behalf of a proposed Class of App users who used App and had their information and communications intercepted by Defendant.

## THE PARTIES

8.    Plaintiff Benjamin Glenn is a natural person and citizen of California, residing in Lakeport, California. Plaintiff Glenn was in California when he created an account on the Upside App and entered information on the App.

9.    Plaintiff Ara Sardarbegians is a natural person and citizen of Pennsylvania, residing in Pittsburgh, Pennsylvania. Plaintiff Sardarbegians was in Pennsylvania when he entered information on the App.

10.   Defendant Mixpanel, Inc. is a Delaware corporation with its principal place of business at Pier 1, Bay 2, The Embarcadero San Francisco, California 94111.

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from Defendant.

12.     This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in this District.

13.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because Defendant resides in this District.

**FACTUAL ALLEGATIONS**

**I.      THE CIPA AND WESCA PROTECT CALIFORNIANS' AND PENNSYLVANIANS' RIGHT TO PRIVACY IN THEIR ONLINE COMMUNICATIONS**

**A.      Background Of The CIPA**

14.     The California Legislature enacted CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

15.     As the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— *the right to control the nature and extent of the firsthand dissemination of his statements*.

*Ribas*, 38 Cal. 3d at 360-61 (1985) (emphasis added; internal citations omitted).  The right to control the dissemination of one's statements or information is encompassed by "both the common law and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the literal understandings of privacy." *See U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989).

16.     Individuals may bring an action against the violator of any provision of the CIPA for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).

17.     Defendant is alleged to have violated two distinct provisions of the CIPA: CIPA § 631(a) and CIPA § 638.51(a).  Both are discussed in turn below.

           *1.     CIPA § 631*

18.     CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

19.     CIPA § 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Javier v. Assurance IQ,*

*LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications."); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

20.    The California Supreme Court has stated an "express objective" of CIPA § 631(a) is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas*, 38 Cal. 3d at 363. "Indeed, it is probable that the Legislature viewed section 631 as a means of proscribing attempts to circumvent other aspects of the Privacy Act, *e.g.*, by requesting a secretary to secretly transcribe a conversation over an extension, rather than tape recording it in violation of section 632." *Id.* at 361.

        *2.    CIPA § 638.51*

21.    CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

22.    A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

23.    A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

24.    In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

25.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology has advanced, however, courts have expanded the application of these surveillance devices.

26.     For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address the email was sent to, and the subject line—because this is the user's *outgoing* information.  On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is *incoming* information that is being sent to that same user.

27.     Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also*, *e.g.*, *Shah v. Fandom, Inc.* --- F. Supp. 3d ---, 2024 WL 4539577, at *4 (N.D. Cal. Oct. 21, 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC* (N.D. Cal. Dec. 12, 2024) 2024 WL 5102709, at *3-4 (same); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register").  This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection."  *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

**B.      Background Of The WESCA**

28.     Similar to CIPA § 631(a), WESCA protects Pennsylvania residents from the wiretapping of their confidential communications without their consent.  "[T[he WESCA is to be strictly construed to protect individual privacy rights."  *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 129 (3d Cir. 2022) (cleaned up).

29.     Specifically, the WESCA prohibits (i) the interception or procurement of another to intercept any wire, electronic, or oral communication; (ii) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (iii) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew

1  or should have known was obtained through the interception of a wire, electronic, or oral

2  communication.  18 Pa. Cons. Stat. §§ 5703(1)-(3).

3       30.    The WESCA applies to electronic communications, such as those on websites and

4  mobile applications.  *Popa*, 52 F.4th at 126.

5  **II.    DEFENDANT VIOLATES THE CIPA AND THE WESCA**

6       **A.    Testing Reveals Defendant Collects App Users' Personally Identifying
            Information Without Their Consent**

7       31.    In September 2024, Plaintiffs' counsel retained a private research company to review

8  the App and conduct a dynamic analysis.  A "dynamic analysis" records the transmissions that occur

9  from a user's device.  The private researchers tested what information (if any) was disclosed when a

10  user creates an account and accesses the services offered on the App.

11       32.    The analysis first established that Defendant's "software development kit" ("SDK")

12  and "application programming interface" ("API") are installed on the App.  That means that

13  Defendant itself is collecting whatever information Upside chooses to disclose to it, rather than

14  Upside collecting the information.

15       33.    An SDK is a "set of tools for developers that offers building blocks for the creation

16  of an application instead of developers starting from scratch … For example, Google Analytics

17  provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[4]

18  An API "acts an intermediary layer that processes data transfer between systems, letting companies

19  open their application data and functionality to external third-party developers [and] business

20  partners."[5]  An API can "work[] as a standalone solution or included within an SDK … [A]n SDK

21  often contains at least one API."[6]  APIs "enable[] companies to open up their applications' [or

22  websites'] data and functionality to external third-party developers, business partners, and internal

23  departments within their companies."[7]

[4] API VS. SDK: THE DIFFERENCE EXPLAINED (WITH EXAMPLES), https://getstream.io/glossary/api-vs-sdk/.

[5] IBM, *What is an API?*, available https://www.ibm.com/topics/api.

[6] SDK VS. API: WHAT'S THE DIFFERENCE?, IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface).

[7] APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

34.     The dynamic analysis found that when users with an account on the Android App interact with or submit cashback claims on the App, Mixpanel acquires users' personally identifiable information ("PII").  For instance, when the researchers submitted a cashback claim, Mixpanel acquired the offer type (restaurant), that the offer was claimed by the account holder, the dollar amount of the offer ($0.06 per gallon), the name of the offeror (Headlands Brewing), and the distance of the store to the user.  But, more invasively, Mixpanel also acquired the account holder's: (i) precise geolocation; (ii) AAID; (iii) unique user ID; and (iv) unique device ID:



35.     Mixpanel did not obtain App users' consent before intercepting this information.

36.     Each interception of each piece of information happens contemporaneously to when users submit requests or enter information into the App.

37.     Since at least October 2022, if not earlier, Defendant used its software to intercept users' communications with the App.

*1.    Defendant Collects App Users' Precise Geolocation*

38.    Geolocation is "the identification of the real-world geographic location of an object."[8] Geolocation identifies an object by "generating a set of geographic coordinates such a latitude and longitude through GPS and using the coordinates to determine a meaningful location."[9]

39.    Geolocation is considered precise when it provides street level accuracy.  Defendant collects even more precise geolocation here.  Specifically, Defendant intercepts App users' geolocation with six decimal places of accuracy.  That means Defendant collects the user's geolocation *within four inches* of their actual location, a level of precision usually reserved for "structural design & surveyance in engineering."  At this level of accuracy, Defendant "can identify a person"[10]:

```
"centerLatLon": "37.890383, -122.292415",
"centerLocationBasedOn": "userLocation",
```

40.    "Geolocation data not only reveals where individuals live, but could also enable inferences about their socioeconomic classes, everyday habits, and health conditions, among others."[11]

41.    Precise geolocation can be used by anyone to uniquely identify a person.  A study in 2013, for example, analyzed mobility data for 1.5 million people, finding that researchers needed only four randomly chosen spatio-temporal points (points that represent the time and location of a specific event, such as watching a video) to uniquely identify 95% of the people (approximately 1.425 million out of 1.5 million) in the dataset.  By contrast, 12 randomly selected points in a fingerprint are enough to uniquely identify a person.[12]

---

[8] WHAT IS GEOLOCATION?, https://www.indicative.com/resource/geolocation/.

[9] WHAT IS GEOLOCATION?, https://www.indicative.com/resource/geolocation/.

[10] PRECISION MATTERS: THE CRITICAL IMPORTANCE OF DECIMAL PLACES, https://blis.com/precision-matters-critical-importance-decimal-places-five-lowest-go/

[11] Irwin Reyes et al., *Won't Somebody Think of the Children? Examining COPPA Compliance at Scale*, 3 PROCEEDINGS ON PRIVACY ENHANCING TECHNOLOGIES 68, 69 (2018), https://petsymposium.org/2018/files/papers/issue3/popets-2018-0021.pdf.

[12] Yves-Alexandre de Montjaye, et al., *Unique in the Crowd: The Privacy Bounds of Human Mobility*, SCIENTIFIC REPORTS 2 (Feb. 4, 2013), https://www.nature.com/articles/srep01376.

42.    As Paul Ohm, a law professor and privacy researcher at Georgetown University Law Center, explained: "[r]eally precise, longitudinal geolocation information is absolutely impossible to anonymize." [13]    In fact, out of all identifiers, "D.N.A. is probably the only thing that's harder to anonymize than precise geolocation information."[14]

43.    Companies collect and disclose geolocation so they can maximize their advertising revenue.    As a *New York Times* article explained: "For brands, following someone's precise movement is key to understanding the 'customer's journey'—every step of the process from seeing an ad to buying a product."

44.    Marketers consider geolocation "the Holy Grail of advertising" because it creates "the complete picture that connects all of our interests and online activity with our real-world actions."[15]

45.    There is no reason for Mixpanel to collect geolocation—let alone the ultra-precise level of geolocation it collects here—other than to bolster its clients' marketing, advertising, and data analytics efforts, and to make its user profiles more comprehensive, as alleged below.

> 2.    *Defendant Collects App Users' AAIDs*

46.    The dynamic analysis also found that Mixpanel collects the AAID from the user's device each time that a transmission is made from an app with the Mixpanel SDK installed, including the Upside App:

```
"android_ifa": "1627a830-3c02-4504-a5d0-caef8a7c660d"
```

47.    An AAID is a unique string of numbers that attaches to a device.  As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across multiple mobile applications.[16]  So, for example, if a third party collects AAIDs from two separate mobile applications, it can track, cross-correlate, and aggregate a user's activity on both applications.

---

[13] Stuart A. Thompson & Charlie Warzel, *Twelve Million Phones, One Dataset, Zero Privacy* N.Y. TIMES (Dec. 19, 2019), https://www.nytimes.com/interactive/2019/12/19/opinion/location-tracking-cell-phone.html.

[14] *Id.*

[15] *Id.*

[16] *See Advertising ID*, GOOGLE, https://support.google.com/googleplay/android-developer/answer/6048248.

---

48.     Although technically resettable, an AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets that identifier.  The fact that the use and disclosure of AAIDs is so ubiquitous evinces an understanding on the part of Defendant, Amplitude, and others in the field that they are almost never manually reset by users (or else an AAID would be of no use to advertisers).  *See also Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022) ("While AAID are resettable by users, the plaintiff plausibly alleges that AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID.") (cleaned up).

49.     Using publicly available resources, an AAID can track a user's movements, habits, and activity on mobile applications.[17]  Put together, the AAID serves as "the passport for aggregating all of the data about a user in one place."[18]

50.     Because an AAID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading and viewing preferences.

### 3.     Defendant Collects App Users' Device IDs and User IDs

51.     Finally, the dynamic analysis found that Mixpanel collect App users' device IDs and user IDs:

```
    "$device_id": "b61ec9c8-8b38-4092-9328-24dd03f5e963",
    "$user_id": "884266f4-3883-4c00-bedc-bec57b3413b2",
```

52.     The "device ID" "is automatically generated by [Defendant's] SDK and then attached to all of the user's events."[19]  The device ID is unique and specific to a device, so a single user might have multiple device IDs if they use a smartphone, computer, tablet, etc.[20]

---

[17] Thomas Tamblyn, *You Can Effectively Track Anyone, Anywhere Just By The Adverts They Receive*, HUFFPOST (Oct. 19, 2017), https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5.

[18] Willie Boag, *Trend Report: Apps Oversharing Your Advertising ID*, IDAC, https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/.

[19] https://docs.mixpanel.com/docs/tracking-methods/id-management/identifying-users-simplified.

[20] *See* https://docs.mixpanel.com/docs/tracking-methods/id-management/identifying-users-original.

53.     The "user ID" is unique to a specific user, even if there are multiple users on one device.[21]  The user ID allows Defendant to group all device IDs to an individual user.

54.     The device ID and user ID also allow Defendant to tie all user interactions on a mobile application, including the App, together and the link those interactions to one person, even if the interactions are sent in different transmissions.  So, even if Defendant receives a user's offer details at a different time from their geolocation, the user ID and device ID allow Defendant to tie those two communications together.

**B.     Defendant Bridges Users' PII Across Multiple Apps**

55.     Defendant's tracking is made more invasive because Defendant tracks users across multiple apps and devices using common identifiers.  Defendant does this using, at the very least, users' AAIDs.

56.     As an example of this, Plaintiffs' counsel also the private researchers test a separate mobile application that incorporates Defendant's software: Zee5.  Zee5 is "the world's largest streaming platform for South Asian stories."[22]  Zee5 is also the subject of a class action lawsuit involving the disclosure of PII to third-party entities, including Defendant.  *See Shah v. Zee Entertainment Enterprises Ltd.*, Case No. 2:23-cv-21722 (D.N.J.).

57.     The private researchers reconfirmed their findings that when a Zee5 account holder watches a video on the Zee5 Android App, Defendant receives the user's: (i) e-mail address, (ii) age, (iii) gender, (iv) AAID, (v) user ID, (vi) device ID, and (vii) the title of the video they viewed:

| THIRD PARTY | PRODUCT INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| **Mixpanel** | Video Title | Email, Age, Gender | AAID, User ID, Device ID |

58.     Crucially, Defendant does not collect Zee5 App users' geolocation.  And Defendant does not collect Upside App users' e-mail addresses.  But Defendant collects the AAIDs of users of both apps, and the AAID for a single user will be identical for both apps.  So, if a person uses both

---

[21] *Id.*

[22] ZEE5: MOVIES, TV SHOWS, SERIES, GOOGLE PLAY STORE https://play.google.com/store/apps/details?id=com.graymatrix.did&hl=en_US&gl=US.

apps, Defendant will tie the person's e-mail address from one app to their geolocation from another app using the person's AAID to create a comprehensive profile of that user:

```
"$device_id": "1182fbb0-41ae-4863-afda-5e8cf302e8fe",
"$user_id": "e880f1e6-aceb-4ef1-bf93-c35e6378d57e",
"Ad ID": "1627a830-3c02-4504-a5d0-caef8a7c660d",
"Advertisement ID": "1627a830-3c02-4504-a5d0-caef8a7c660d",
"Age": "27",
"Email": "dikctyalor@gmail.com",
"Email Opt-in": "N\A",
"First App Launch Date": "2024-09-26 14:27:45.618",
"Gender": "Female"
```
*Defendant's Collection of PII on the Zee5 Android App*

```
"event": "MapView",
"properties": {
"$device_id": "b61ec9c8-8b38-4092-9328-24dd03f5e963",
"$user_id": "884266f4-3883-4c00-bedc-bec57b3413b2",
"centerLatLon": "37.890383, -122.292415",
"centerLocationBasedOn": "userLocation",
"distinct_id": "884266f4-3883-4c00-bedc-bec57b3413b2",
"$device_id": "b61ec9c8-8b38-4092-9328-24dd03f5e963",
"$distinct_id": "884266f4-3883-4c00-bedc-bec57b3413b2",
[...]
"$set": {
[...]
"android_ifa": "1627a830-3c02-4504-a5d0-caef8a7c660d"
},
"$time": 1727386566963,
"$token": "74df1a2fba976037374e054e1859bcfd",
"$user_id": "884266f4-3883-4c00-bedc-bec57b3413b2"
```
*Defendant's Collection of PII on the Upside Android App*

59.    While information like precise geolocation and e-mail address are enough to de-anonymize specific users independently of one another, Defendant's ability to combine the two by tracking users across apps and devices creates a level of de-anonymity and surveillance that is incredibly invasive.  Indeed, Google's own policy states that AAIDs "must not be connected to personally-identifiable information or associated with any persistent device identifier."[23]

60.    Defendant's conduct is an example of "ID Bridging."  "ID Bridging" is the process of "piecing together different bits of information about" a user "to confidently infer that it is the same individual accessing a publisher's site or sites from various devices or browsers."[24]



---

[23] BEST PRACTICES FOR UNIQUE IDENTIFIERS, https://developer.android.com/identity/user-data-ids (cleaned up).

[24] Kayleigh Barber, *WTF Is The Difference Between Id Bridging And Id Spoofing?*, DIGIDAY (July 8, 2024, https://digiday.com/media/wtf-is-the-difference-between-id-bridging-and-id-spoofing/.

---

61.     ID Bridging "has long been the foundation of programmatic advertising,"[25] which is the process by which companies "use [] advertising technology to buy and sell digital ads" by "serv[ing] up relevant ad impressions to audiences through automated steps, in less than a second."[26] It entails a "unique identifier[] assigned to individual devices," including "Google's Advertising ID," personal information like geolocation and e-amil address, and "cross-platform linkage."[27]

62.     ID Bridging is a money-making machine for advertisers and app developers.  On the advertiser side, ID Bridging "increase the chances of an ad buying platform finding their inventory to be addressable and, therefore, maximizes their 'ad yields.'"  And on the app developer side, "publishers can boost revenue from direct-sold campaigns by offering advertisers access to more defined and valuable audiences."[28]  In other words, advertisers will be able to find users that are more directly and likely interested in what is being sold by having access to significantly more information. And app users' information will be more valuable (and therefore, bring in more money to app developers) because it is combined with a plethora of other information from various sources.

63.     While those within the ID Bridging industry describe it as privacy-protective, it is anything but.  As courts have noted, the "ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers" creates "dossiers which can be used to further invade [users] privacy by allowing third parties to learn intimate details of [users'] lives, and target them for advertising, political, and other purposes, ultimately harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them."  *Katz-Lacabe v. Oracle Am., Inc.*, 688 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (cleaned up).

---

[25] https://www.adexchanger.com/data-driven-thinking/how-can-id-bridging-the-foundation-of-our-space-suddenly-be-a-bad-thing/.

[26] PROGRAMMATIC ADVERTISING, https://advertising.amazon.com/blog/programmatic-advertising#.

[27] Anete Jodzevica, I*D Bridging: The Privacy-First Future of Audience Targeting*, SETUPAD (Nov. 15, 2024), https://setupad.com/blog/id-bridging/.  Ironically, the example given in this article is a "hashed e-mail," where the e-mail Defendant collected in this example is not hashed.

[28] Bennett Crumbling, *What Is 'ID Bridging' And How Publishers Use It To Grow Direct And Programmatic Revenue?*, OPTABLE (Aug. 22, 2024. https://www.optable.co/blog/what-is-id-bridging.

64.     In February 2019, Oracle published a paper entitled "Google's Shadow Profile: A Dossier of Consumers Online and Real World Life," part of which provides as accurate a description of Google's services (and Oracle's, ironically) as Defendant's:

> a consumer's "shadow profile" [is a] massive, largely hidden dataset[] of online and offline activities. This information is collected through an extensive web of … services, which is difficult, if not impossible to avoid. It is largely collected invisibly and without consumer consent. Processed by algorithms and artificial intelligence, this data reveals an intimate picture of a specific consumer's movements, socio-economics, demographics, "likes", activities and more. It may or may not be associated with a specific users' name, but the specificity of this information defines the individual in such detail that a name is unnecessary.[29]

65.     In other words, ID Bridging is dangerous because of the sheer expanse of information being compiled by companies like Defendant without the knowledge or consent of users, all of which is being done for pecuniary gain.

66.     Defendant's role in ID Bridging is to compile the user profiles that are ultimately sold to advertisers. Defendant is quite successful at this, given Defendant's software is present on a number of popular apps, including but not limited to Uber, Netflix, and Ticketmaster.[30] That means that if the same user visits any of the numerous apps that Defendant's software is integrated into, Defendant will track that user across all of the apps and link that user's personal information together from each of the apps to form a comprehensive profile of the user.

**C.     Defendant Builds Comprehensive User Profiles Targeted Marketing, Advertising, And Analytics**

67.     Defendant defines itself as "an analytics tool that enables you to capture data on how users interact with your digital product. Mixpanel then lets you analyze this data with simple, interactive reports that let you query and visualize the data with just a few clicks."[31] However, Defendant's services are much more comprehensive.

68.     As relevant here, one of Defendant's features is the creature of "User Profiles," which allow its clients to "enrich events [actions taken by users] with demographic attributes (*i.e.* user

---

[29] Google's Shadow Profile: A Dossier of Consumers Online and Real World Life at 1 (Feb. 2019), https://tinyurl.com/2mtuh7vf.

[30] Customers, https://mixpanel.com/customers/.

[31] What is Mixpanel?, Mixpanel, https://docs.mixpanel.com/docs/getting-started/what-is-mixpanel.

properties) about the users that performed those events."[32]   "Mixpanel's enrichment layer joins all of this data together for analysis."[33]



Here, we're looking at a user profile that represents an actual user in our app.

69.    As noted above, Defendant joins all user events with their demographic traits with the user ID attribute.  Indeed, Defendant encourages its clients to "use the same Distinct ID for both events and use profile for the same user" for more comprehensive analytics.[34]  And, as also noted above, Defendant is pulling in information about those same users from other apps by bridging users' AAIDs and connecting even wider swaths of PII together.

70.    User profiles are useful to Defendant's clients for a number of different reasons. Again, Defendant touts itself as an "analytics" company, but that really means "analyz[ing] the user's personality, deriv[ing] inferences about their interests, or influenc[ing] their future behavior."[35]

71.    To wit, Defendant offers the "Signal" function to its clients like Upside, which "measures the association between a correlation event and a goal event and quantifies the correlation between the two. This facilitates a deeper understanding of the behaviors that drive customer conversions, and can help guide product decisions."[36]

---

[32] https://docs.mixpanel.com/docs/data-structure/user-profiles

[33] https://youtu.be/PbKnQ777vuk?si=m_mA-nCjOaqGJ58R&t=177.

[34] https://docs.mixpanel.com/docs/data-structure/user-profiles

[35] April Falcon Doss, CYBER PRIVACY at 71 (2020).

[36] https://docs.mixpanel.com/docs/reports/apps/signal.

72.    In other words, Defendant takes the information it conglomerates about users to help its clients predict why particular users might or might not take particular actions.  As the example Defendant gives details:

> [a] music sharing app may want to understand the correlation between top events and users who purchase a song on the app.  It is important to understand what the optimal actions that users take before purchasing a song are.
>
> …
>
> "Song Played" could have a strong positive correlation with purchasing a song. Most of the users who played a song later purchased a song.[37]

73.    The purpose of this exercise is to use the information gathered "in future product decisions.  By knowing that those who play songs are more likely to purchase songs, it is possible to build tools to encourage song plays. This could lead to a dramatic increase in the amount of users purchasing songs."  So again, by "analytics," Defendant means understanding user behavior at a deep level to influence it.

74.    On the marketing and advertising side, Defendant allows clients like Upside to group users together in "Cohorts," which are "groups of users that share a certain set of properties or who perform a similar sequence of events."[38]  But because Defendant has these comprehensive user

---

[37] https://docs.mixpanel.com/docs/reports/apps/signal.

[38] https://docs.mixpanel.com/docs/users/cohorts#saving-and-sharing-cohorts

profiles, the users that took certain actions are easily identifiable.  Indeed, in the example screenshot from Defendant's website below, users are identifiable from their e-mail addresses.



75.     These Cohorts—which, again, are groups of user profiles linked together by various properties—can be used for analytics, which enables Defendant's clients to "import these cohorts into other reports and perform analyses on those specific users" to "gain a deeper understanding of how they interact with your website or application" (*i.e.*, influencing user behavior).[39]



---

[39] USERS: EXPLORE YOUR USER BASE IN MIXPANEL, https://docs.mixpanel.com/docs/users.

76.    However, these Cohorts can also be disclosed by Defendant to even further third parties to assist Defendant's clients with "audience targeting."[40]   For instance, Defendant can disclose Cohorts to Google Ads "to use targeted advertisements in Google Search."  Defendant specifically states it will send Google "an email address" and "an advertising ID," in addition to other PII Defendant may have.  Google will then "use[] email addresses to match users from the cohort with users from their system.  If they do not have the email address, they will instead use … the device advertising ID."[41]

77.    Likewise, Defendant can disclose Cohorts to Facebook Ads "to use targeted advertisements in Facebook."  As with Google, Defendant will send Facebook "an email address" and "an advertising ID user property," in addition to other PII Defendant may have.  Facebook will then "use[] email addresses to match users from the cohort with users from their system.  If they do not have the email address, they will instead use … the device advertising ID."[42]

78.    In addition to disclosing the collected information to even further third parties, Defendant also has the capability to use the collected information to "maintain[] and improv[e]" its own services, as well as use allegedly "de-identified and aggregated" data for its "own business purposes, including use, duplication, modification, and creation of derivative works regarding usage and performance of Aggregated Data."[43]

79.    In sum, Defendant uses or has the capability to use the information it collects on various mobile applications—including the Upside App—for at least the following purposes:

- Compiling comprehensive user profiles that include PII matched with interactions taken by users.
- Being able to bridge user information across multiple apps and devices to enhance Defendant's ability to assist clients with marketing, advertising, and analytics.
- Performing comprehensive analytics on those user profiles—or groups of user profiles—to gain insights that

---

[40] INTEGRATIONS: EXPORT YOUR COHORTS TO A THIRD-PARTY TOOL, https://docs.mixpanel.com/docs/cohort-sync/integrations

[41] GOOGLE ADS, https://docs.mixpanel.com/docs/cohort-sync/integrations/google-ads.

[42] FACEBOOK ADS, https://docs.mixpanel.com/docs/cohort-sync/integrations/facebook-ads.

[43] LEGAL, https://mixpanel.com/legal/terms-of-use/.

will influence user behavior on Defendant's client's mobile applications, such as making additional purchases.

- Disclosing user profiles—or groups of user profiles—to various other third parties like Google and Facebook for targeted marketing and advertising.

- Using the information of Defendant's client's end users to improve and maintain Defendant's services.

## III.    PLAINTIFFS' EXPERIENCES

### A.    Plaintiff Glenn

80.    In or about 2021, Plaintiff Benjamin Glenn created an Upside account.  Plaintiff Glenn continued to access the App, enter information into the App, and submit cashback requests until October 2024.  At all relevant times, Plaintiff Glenn was in California when he accessed the App on his Android phone and entered personal information into the App.

81.    As Plaintiff Glenn interacted with the App, Defendant intercepted, read, learned, viewed, and processed Plaintiff Glenn's communications with Upside in real time, including the offers that Plaintiff Glenn viewed and accepted.  Defendant also collected Plaintiff Glenn's personal information, such as his precise geolocation and AAID.

82.    Plaintiff Glenn was not on notice of any of Defendant's wiretapping when he used the App, nor did she ever consent, agree to, or otherwise permit the same.  Nor did Defendant obtain a court order or otherwise procure Plaintiff Glenn's consent for the same.

83.    Nevertheless, Defendant wiretapped Plaintiff Glenn's communications with Upside on the App, collected Plaintiff Glenn's PII, and used that information for marketing, advertising, and data analytics purposes.  This included but was not limited to creating a profile for Plaintiff Glenn, disclosing Plaintiff Glenn's information to even further third parties for targeted marketing and advertising, performing analytics on Plaintiff Glenn's interactions with the App to influence his user behavior, and using Plaintiff Glenn's information to improve Defendant's products and services.

84.    Further, because Defendant collected Plaintiff Glenn's AAID, Defendant was able to bridge Plaintiff Glenn's interactions on the App with any other mobile application where Defendant's SDK was also integrated and on which Defendant also collected Plaintiff Glenn's AAID.  Thus, Defendant was able to create an even more revealing portrait of Plaintiff Glenn's online activity, and therefore, Plaintiff Glenn's personal information, preferences, and interests.

**B.    Plaintiff Sardarbegians**

85.    In or about 2018, Plaintiff Ara Sardabegians created an Upside account.  Plaintiff continued to access the App, enter information into the App, and submit cashback requests while in the state of Pennsylvania from approximately June 2024 until October 2024.  From approximately June to October 2024, Plaintiff Sardabegians was in Pennsylvania when he accessed the App on his Android phone and entered personal information into the App.

86.    As Plaintiff Sardabegians interacted with the App, Defendant intercepted, read, learned, viewed, and processed Plaintiff Sardabegians' communications with Upside in real time, including the offers that Plaintiff Sardabegians viewed and accepted.  Defendant also collected Plaintiff Sardabegians' personal information, such as her precise geolocation and AAID.

87.    Plaintiff Sardabegians was not on notice of any of Defendant's wiretapping when he used the App, nor did he ever consent, agree to, or otherwise permit the same.  Nor did Defendant obtain a court order or otherwise procure Plaintiff Sardabegians' consent for the same.

88.    Nevertheless, Defendant wiretapped Plaintiff Sardabegians' communications with Upside on the App, collected Plaintiff Sardabegians' PII, and used that information for marketing, advertising, and data analytics purposes.  This included but was not limited to creating a profile for Plaintiff Sardabegians, disclosing Plaintiff Sardabegians' information to even further third parties for targeted marketing and advertising, performing analytics on Plaintiff Sardabegians' interactions with the App to influence his user behavior, and using Plaintiff Sardabegians' information to improve Defendant's products and services.

89.    Further, because Defendant collected Plaintiff Sardabegians' AAID, Defendant was able to bridge Plaintiff Sardabegians' interactions on the App with any other mobile application where Defendant's SDK was also integrated and on which Defendant also collected Plaintiff Sardabegians' AAID.  Thus, Defendant was able to create an even more revealing portrait of Plaintiff Sardabegians' online activity, and therefore, Plaintiff Sardabegians' personal information, preferences, and interests.

## CLASS ALLEGATIONS

90.     **California App Class Definition**: Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), Plaintiff Glenn seeks to represent a Class of all persons in California who used an Android mobile application in California where Defendant's SDK and/or API were integrated during the Class Period and whose communications were collected by Defendant.

91.     **Pennsylvania App Class Definition**: Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), Plaintiff Sardabegians seeks to represent a Class of all persons in Pennsylvania who used an Android mobile application in Pennsylvania where Defendant's SDK and/or API were integrated during the Class Period and whose communications were collected by Defendant.

92.     **California Upside App Class Definition:** Plaintiff Glenn also seeks to represent a Subclass of all persons in California who used the Upside Android mobile application in California during the Class Period and whose communications were collected by Defendant.

93.     **Pennsylvania Upside App Class Definition:** Plaintiff Sardabegians also seeks to represent a Class of all persons in Pennsylvania who used the Upside Android mobile application during the Class Period and whose communications were collected by Defendant.

94.     Plaintiffs collectively refer to each of these Classes and Subclasses as the "Class," and Members of the Classes and Subclasses as "Class Members," unless otherwise stated.  The California App Class and California Upside App Class shall be collectively referred to as the "California Class" and "California Class Members," and the Pennsylvania App Class and Pennsylvania Upside App Class shall be collectively referred to as the "Pennsylvania Class" and "Pennsylvania Class Members."

95.     Plaintiffs reserve the right to modify the class and subclass definitions or add additional subclasses as necessary prior to filing a motion for class certification.

96.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering any tolling, concealment, and/or accrual issues, and ending on the date of entry of judgement.

97.     Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee

of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

98.    **Numerosity.**  Class Members are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiffs at this time; however, it is estimated that there are thousands or millions of individuals in the Class.  The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Upside.

99.    **Commonality/Predominance**.  There are questions of law and fact common to the Class Members that predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class.  Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Class include:

- whether Defendant collected Plaintiff's and Class Members' communications with the App or any other mobile application;
- whether the communications that Defendant collected include the "contents" of those communications;
- whether Plaintiff Glenn and California Class Members are entitled to damages under CIPA; and
- whether Plaintiff Sardarbegians and Pennsylvania Class Members are entitled to damages under WESCA.

100.    **Typicality.**  Plaintiffs' claims are typical of the claims of the Class because Plaintiffs used the Upside App and Defendant collected Plaintiffs' communications without their express written authorization or knowledge.  Plaintiffs' claims are based on the same legal theories as the claims of other Class Members.

101.    **Adequacy.**  Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of Class Members.  Plaintiffs' interests are coextensive with, and not antagonistic to, those of other Class Members.  Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the field of digital privacy

1    litigation specifically.  Plaintiffs' attorneys are committed to vigorously prosecuting this action on

2    behalf of the Class.

3        102.    **Superiority.** Class action treatment is a superior method for the fair and efficient

4    adjudication of this dispute.  Such treatment will permit a large number of similarly situated persons

5    to prosecute their common claims in a single forum simultaneously, efficiently, and without the

6    unnecessary duplication of evidence, effort, or expense that numerous individual actions would

7    engender.  The benefits of proceeding through the class mechanism, including providing injured

8    persons or entities a method for obtaining redress on claims that could not practicably be pursued

9    individually, substantially outweighs potential difficulties in management of this class action.

10   Plaintiffs know of no special difficulty in litigating this action that would preclude its maintenance

11   as a class action.

**CAUSES OF ACTION**

**COUNT I**
**Violation Of The CIPA § 631(a)**

13       103.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth

15   herein.

16       104.    Plaintiff Glenn brings this count individually and on behalf of the California Class

17   against Defendant.

18       105.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of

19   conduct."  *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability

20   under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine,

21   instrument, contrivance, or in any other manner," does any of the following:

22
23           Intentionally taps, or makes any unauthorized connection, whether
             physically, electrically, acoustically, inductively or otherwise, with
24           any telegraph or telephone wire, line, cable, or instrument, including
             the wire, line, cable, or instrument of any internal telephonic
25           communication system,

26           *Or*

27           Willfully and without the consent of all parties to the
             communication, or in any unauthorized manner, reads or attempts to

28

read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

106.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

107.    Defendant's SDK and/or API are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

108.    Defendant is "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Defendant had the capability to use the wiretapped information for a purpose other than simply recording the communications and providing those communications to its clients. Accordingly, Defendant was a third party to any communication between Plaintiff Glenn and California Class Members, on the one hand, and the operator of any Android mobile application where Defendant's software is integrated—including but not limited to Upside—on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

109.    At all relevant times, Defendant willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents the electronic communications of Plaintiff Glenn and California Class Members, on the one hand,

and the operator of any Android mobile application where Defendant's software is integrated—including but not limited to Upside—on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

110.    At all relevant times, Defendant used or attempted to use the intercepted communications of Plaintiff Glenn and California Class Members.

111.    Plaintiff Glenn and California Class Members did not provide their prior consent to Defendant's intentional interception, reading, learning, recording, collection, and usage of Plaintiff Glenn's and California Class Members' electronic communications.

112.    The wiretapping of Plaintiff Glenn and California Class Members occurred in California, where Plaintiff Glenn and California Class Members accessed the mobile applications—including the Upside App—and where Defendant routed Plaintiff Glenn and California Class Members' electronic communications to Defendant's servers.

113.    Pursuant to Cal. Penal Code § 637.2, Plaintiff Glenn and California Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

<u>COUNT II</u>
**Violation Of The CIPA § 638.51(a)**

114.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

115.    Plaintiff Glenn brings this count individually and on behalf of the California Class against Defendant.

116.    Plaintiff Glenn brings this claim in the alternative and to the extent the Court determines that Defendant is not collecting the "contents" of Plaintiff Glenn's and California Class Members' communications with any Android mobile application, including but not limited the Upside App.

117.    CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

118.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

119.    Defendant's SDK and/or API are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the geolocation, AAID, and other PII—from the electronic communications transmitted by Plaintiff Glenn's and California Class Members' Android mobile phones.  Cal. Penal Code § 638.50(b); *see also Shah*, 2024 WL 4539577, at *3; *Mirmalek*, 2024 WL 4102709, at *3.

120.    At all relevant times, Defendant used its SDK and/or API—which are pen registers—to collect Plaintiff's and Class Members' PII, including but not limited to their geolocation, AAID, and other identifiers.  Defendant also used the information it collected for marketing, advertising, and analytics purposes, which bolstered Defendant's and its clients' revenue.

121.    Defendant's SDK and API do not collect the content of Plaintiff Glenn's and California Class Members' electronic communications with the Android mobile applications, including but not limited to the Upside App.  *See In re Zynga Privacy Litig.* 750 F.3d 1098, 1104 (9th Cir. 2014) (holding that "record information includes, among other things, the name, address, and subscriber number or identity of a subscriber to or customer of such service") (cleaned up).

122.    Plaintiff Glenn and California Class Members did not provide their prior consent to Defendant's use or use of the SDK or API.  Nor did Defendant obtain a court order to install or use its SDK or API.

123.    Pursuant to Cal. Penal Code § 637.2, Plaintiff Glenn and California Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## COUNT III
### Violation Of The WESCA

124.    Plaintiffs repeat the allegations in the foregoing paragraphs as if fully set forth herein.

125.    Plaintiff Sardarbegians brings this claim individually and on behalf of the Pennsylvania Class against Defendant.

126.    The WESCA prohibits (i) the interception or procurement of another to intercept any wire, electronic, or oral communication; (ii) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (iii) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication.  18 Pa. Cons. Stat. §§ 5703(1)-(3).

127.    Defendant's SDK and/or API are an "electronic, mechanical, or other device" or "apparatus … that can be used to intercept" an electronic communication.  18 Pa. Cons. Stat. § 5702.

128.    At all relevant times, by using its SDK and API, Defendant intercepted, used, and disclosed the electronic communications of Plaintiff Sardarbegians and Pennsylvania Class Members, on the one hand, and the operators of the Android mobile applications—including but not limited to Upside—on the other hand.

129.    Defendant intended to intercept Plaintiff Sardarbegians and Pennsylvania Class Members' electronic communications.  Defendant contracted with the operators of the Android mobile applications—including but not limited to Upside—for the provision of its services in the mobile application.  Defendant provided guidance to the operators of the Android mobile applications—including but not limited to Upside—to configure and install its SDK and API on the Android mobile application, and Defendant's services operated exactly as intended by Defendant on each of the Android mobile applications.  Defendant also used the intercepted information to bolster its clients' advertising and marketing efforts, and Defendant used the intercepted information to improve the provision of its service to the operators of the Android mobile applications—including but not limited to Upside—and future clients.

130.    Plaintiff Sardarbegians and Pennsylvania Class Members did not provide their prior consent to having their electronic communications intercepted by Defendant.

131.    Plaintiff Sardarbegians and Pennsylvania Class Members had a justified expectation under the circumstances that their electronic communications would not be intercepted by the Defendant, given they were communicating sensitive personally identifiable information. Plaintiff and Class Members reasonably believed these communications would only be accessed by the operators of the Android mobile applications—including but not limited to Upside—and not by a third party like Defendant.   Further, Plaintiff Sardarbegians and Pennsylvania Class Members reasonably had no expectation that more sensitive information than perceivably necessary (such as super precise geolocation) would be collected by Defendant, that user profiles would be compiled and created by Defendant, or that Defendant would be able to bridge Plaintiff Sardarbegians' and Pennsylvania Class Members' PII across mobile applications.

132.    Because the use of Defendant's SDK or API is not disclosed—certainly not before any wiretapping occurred— Plaintiff Sardarbegians and Pennsylvania Class Members were not aware that their electronic communications were being intercepted by Defendant.

133.    The wiretapping of Plaintiff Sardarbegians and Pennsylvania Class Members occurred in Pennsylvania, where Plaintiffs and Subclass Members accessed the App and where Defendant routed Plaintiff Sardarbegians' and Pennsylvania Class Members' electronic communications to Defendant's servers.  *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 131 (3d Cir. 2022).

134.    Pursuant to 18 Pa. Cons. Stat. § 5725(a), Plaintiff Sardarbegians and Pennsylvania Class Members have been injured by Defendant's violations of the WESCA, and each seeks: (i) damages of not less than $100/day for each violation or $1,000 for each violation, whichever is higher; (ii) punitive damages; and (iii) reasonable attorneys' fees and other litigation costs incurred.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)    For an order certifying the Class under Fed. R. Civ. P. 23 of, naming Plaintiffs as the representative of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that Defendant's conduct violates the CIPA and the WESCA;

(c)    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)    An award of statutory damages to the extent available;

(e)    For punitive damages, as warranted, in an amount to be determined at trial;

(f)    For pre-judgment interest on all amounts awarded; and

(g)    For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of any and all issues so triable.

Dated:  January 28, 2025                          Respectfully submitted,

**BURSOR & FISHER, P.A**.

By: */s/ L. Timothy Fisher*
         L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
            jwilner@bursor.com

*Attorneys for Plaintiffs*